1      **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE MAAME EWUSI-MENSAH FRIMPONG, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**              )
                                                )
6                        **Plaintiff,**         )
                                                )
7         **vs.**                               )   **Case No. CR 22-267 MEMF**
                                                )
8   **DEL ENTERTAINMENT, INC.;**               )
    **JOSE ANGEL DEL VILLAR;**                 )
9   **LUCA SCALISI; and**                      )
    **JESUS PEREZ ALVEAR,**                    )
10                                              )
                         **Defendants.**        )
11  _____)

12

13            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
                       **STATUS CONFERENCE**
14             **FRIDAY, AUGUST 5, 2022**
                       **10:07 A.M.**
15             **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22  _____

23       **MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
                  FEDERAL OFFICIAL COURT REPORTER
24                350 WEST 1ST STREET, ROOM 4455
                  LOS ANGELES, CALIFORNIA  90012
25                       (213) 894-2305


                     **UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4         TRACY L. WILKISON
          United States Attorney
5         BY:  BENEDETTO L. BALDING
               Assistant United States Attorney
6         United States Courthouse
          312 North Spring Street
7         Los Angeles, California  90012

8

9     **FOR THE DEFENDANT DEL ENTERTAINMENT, INC.:**

10        GIBSON, DUNN & CRUTCHER, LLP
          BY:  JAMES N. ROTSTEIN
11             Attorney at Law
          333 South Grand Avenue
12        Los Angeles, California  90071

13

14    **FOR THE DEFENDANT JOSE ANGEL DEL VILLAR:**

15        HOLLAND & KNIGHT, LLP
          BY:  EDDIE A. JAUREGUI
16             Attorney at Law
          400 South Hope Street, Eighth Floor
17        Los Angeles, California  90071

18        HOLLAND & KNIGHT, LLP
          BY:  RICHARD B. ROPER, III
19             Attorney at Law
          1722 Rough Street, Suite 1500
20        Dallas, Texas  75201

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1    APPEARANCES OF COUNSEL, CONTINUED:

 2


 3    FOR THE DEFENDANT LUCA SCALISI:

 4        LAW OFFICES OF ROMERO KOZUB
          BY:  ROSE L. ROMERO
 5            Attorney at Law
          235 NE Loop 820, Suite 105
 6        Hurst, Texas  76053

 7        MICHELMAN & ROBINSON, LLP
          BY:  SCOTT D. TENLEY
 8            Attorney at Law
          17901 Von Karman Avenue, 10th Floor
 9        Irvine, California  92614

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

|   |   |
|---|---|
| | 1 |

```
                    FRIDAY, AUGUST 5, 2022; 10:07 A.M.

                      LOS ANGELES, CALIFORNIA

                              -oOo-

                THE COURTROOM DEPUTY:  Calling Item 1, LA Criminal

        Case 22-267, United States of America versus Defendant 1,

        Del Entertainment, Incorporated; Defendant 2, Jose Angel

        Del Villar; Defendant 3, Luca Scalisi.

                Counsel, please state your appearances.

                MR. BALDING:  Good morning, Your Honor.  Ben Balding

        for the United States.

                MR. ROTSTEIN:  Good morning, Your Honor.

        James Rotstein of Gibson Dunn on behalf of Del Entertainment,

        Incorporated.

                MR. JAUREGUI:  Good morning, Your Honor.

        Eddie Jauregui and Richard Roper from Holland & Knight on

        behalf of Angel Del Villar, who is joining us via Zoom today,

        Your Honor.

                MR. TENLEY:  Good morning, Your Honor.  Scott Tenley

        and Rose Romero on behalf of Mr. Scalisi who is present on

        bond.

                THE COURT:  Give me just one moment.

                (Pause in the proceedings.)

                THE COURT:  Okay.  Good morning again to everyone.

        Good morning to all counsel.  Good morning to Mr. Scalisi.  And

        good morning, Mr. Del Villar.
```

1
2
3
4
10:07AM 5
6
7
8
9
10:08AM 10
11
12
13
14
10:08AM 15
16
17
18
19
10:08AM 20
21
22
23
24
10:10AM 25

1          I'm going to be looking at you on the big screen in

2     the back.  So you're bigger than life size, let's just say

3     that.

4          So the purpose of today's hearing, it's a status

10:10AM  5     conference.  I appreciate the parties coming in today.  I have

6     had a chance to review the Complaint as well as the Indictment

7     in this matter.

8          And if I may address myself specifically to

9     Mr. Scalisi and Mr. Del Villar, in this matter some weeks ago,

10:10AM 10     you appeared before another judge for what is called the

11     arraignment in your case where you heard the charges against

12     you and you entered your pleas of not guilty.

13          And in our system of justice, the Government has to

14     prove their case against you beyond a reasonable doubt.

10:11AM 15          I'm the judge who's going to be handling the

16     proceedings from here on out.  And one of the things that I

17     hope to learn today is what the Government -- what evidence the

18     Government plans to use to attempt to prove its case against

19     you beyond a reasonable doubt.

10:11AM 20          So I'll ask the Government to give me an outline of

21     that.  I have some logistical questions.  And then I will also

22     find out from your attorneys as well as the attorney for

23     Del Entertainment whether there's anything they need at this

24     time.  And then we can also talk about timing going forward.

10:11AM 25          If at any point you don't -- you can't hear me or

                1  you don't understand something that I'm saying, please ask your

                2  attorney to interrupt.  I'm happy to take a break for you to

                3  speak with your attorney privately.

                4        And, Mr. Del Villar, I understand you have some

10:12AM         5  health concerns.  I hope that you're feeling better soon.  If

                6  at any point you need to take a break or you want to speak with

                7  your attorney privately, just sort of wave your hand.  We'll

                8  take a break and find a way for you to speak with your attorney

                9  privately.  Understood?

10:12AM        10        DEFENDANT DEL VILLAR:  Yes.  Thank you, Your Honor.

               11        THE COURT:  Okay.  Thank you.

               12        Understood, Mr. Scalisi?

               13        DEFENDANT SCALISI:  Yes.

               14        THE COURT:  Okay.  Thank you.

10:12AM        15        With that, let me start with you, Mr. Balding.

               16        As I mentioned, I have read the Complaint and the

               17  Indictment, but perhaps you could give the Court just a little

               18  bit of color and context and then explain what types of

               19  evidence and witnesses you plan to use.

10:12AM        20        And you can take the podium.

               21        MR. BALDING:  Thank you, Your Honor.

               22        THE COURT:  And while you're getting up there, I

               23  know we still have the issue of the request concerning

               24  Mr. Del Villar's passport.  We'll definitely handle that before

10:12AM        25  the end of today.

                    MR. JAUREGUI:  Yes.  And I apologize, Your Honor.  I
directed that to Judge Abrams, not knowing where it should go.
And I'll direct any future filings towards this Court.

                    THE COURT:  Okay.  That's fine.  Thank you.

                    MR. BALDING:  Good morning.  Thank you, Your Honor.

                    And I haven't appeared before Your Honor yet.  So if
I'm providing too much or too little detail, please just feel
free to tell me that I'm doing that.

                    But I think it's helpful to give a little bit of a
background on the investigation because I think it will help
understand kind of where we're at today and color the
Indictment slightly.

                    It's been an investigation that's been ongoing for
approximately a decade, since 2003.  And as pertains to the
defendants, I think what's most relevant is that, in large
part, the company Del Entertainment is part of Del Records.
They represent artists that perform in concerts, in part.  Some
of those concerts occur in Mexico.

                    When there's a concert that's performed in Mexico --
and these are legitimate -- from what we can tell, legitimate
concerts -- some are promoted by one of the defendants,
Perez Alvear, Jesus Perez Alvear, AKA Chucho.

                    This is prior to the 2018 --

                    THE COURT:  First of all, I'm going to ask you to
slow down just a little bit for the sake of the reporter.

1          And then Mr. Alvear is the defendant who is not

2  present.  I assume he's not been apprehended.

3          MR. BALDING:  That's correct.

4          THE COURT:  And he's on the one who's on the

5  sanctions list.

6          MR. BALDING:  That's correct.

7          THE COURT:  Okay.  Go ahead.  Thank you.

8          MR. BALDING:  So prior to his designation, which is

9  what kind of starts the conduct charged in the Indictment,

10  prior to that, he is working with Del Entertainment,

11  Mr. Del Villar, and Mr. Scalisi and the company to promote

12  concerts in Mexico by artists that are signed up with the

13  company.

14          Now, the investigation is looking at various things,

15  but I won't get into exactly all of those details.  At some

16  point on April 6th, 2018, the Department of the Treasury

17  designates Mr. Perez, or Chucho as is his alias, as a narcotics

18  trafficker, specially designated narcotics trafficker.

19          At that point, to do business with him, whether

20  legitimate or illegitimate -- in other words, the Government

21  doesn't have to prove the concerts are for the purpose of

22  laundering drug funds or anything like that, just the

23  transaction or the attempt to evade the sanctions specified in

24  the statute become the unlawful conduct.

25          So what we're focused on in the Indictment now is if

1    you knowingly and willfully violate that statute by continuing

2    to do business with a designated narcotics trafficker,

3    specially designated narcotics trafficker -- here, Mr. Perez --

4    then that is the charged criminal conduct.

10:15AM  5    So that's how we get to where we are in the

6    Indictment, Your Honor, if that makes sense.

7    So to prove those charges, the elements would be

8    knowledge of the designation.  In other words, it's not just

9    doing business with someone on that list but knowingly and

10:15AM  10   willfully to do so.  That makes it the criminal -- we believe

11   that makes the criminality aspect.  And then, also, to prove

12   either a transaction or an attempt to evade or conspiracy to do

13   so.

14   So going back, the evidence that the Government

10:16AM  15   would introduce to prove those charges comes from various

16   sources.  I'll try to take them chronically; although, that

17   might not make the most sense, but I have to go some direction.

18   So we have a return from a search warrant, a federal

19   search warrant that show intercommunications within the

10:16AM  20   company, including with a publicist, around April 6th, 2018,

21   starting, but the key conversations are a few weeks later.

22   What happens is on April 6th or thereabouts, right

23   around the time of the designation, the publicist gets some

24   alert from someone outside the company, "Hey, this person's

10:16AM  25   designated, they promote one of your artists, don't they?"

something to that effect, Your Honor.  And that triggers
internally what appears to be a draft of a letter written on
behalf of that artist by the company to his fans that was never
sent.  It was never published.  But the draft acknowledges --
in essence, acknowledges the designation of Perez.  In other
words, kind of soothing his fans, "Hey, I would never do
anything to do business with someone on the list," something of
that nature, Your Honor.  So that's one piece.

          Later, this publicist is talking internally.  And
what happened was that artist was scheduled to perform in a
concert at the end of that month, April 27th, 2018, which
actually took place in the early morning hours of the 28th of
April, 2018.

          So the designation --

          THE COURT:  And that's the Aguas Calientes concert.

          MR. BALDING:  That's correct, Your Honor.

          So, again, this concert had already been planned
prior to the designation.  And so the issue becomes, once you
learn of the designation, whether the company goes forward with
the concert or anyone involved that knows goes forward with the
concert.

          So in terms of knowledge of the designation, there's
that fact, the internal company communications.

          There's also on April 19th -- so less than two weeks
after the formal designations -- agents, one of whom is sitting

in the room today, met with the artist in Phoenix at the

airport and provided him a copy of the letter, explained to him

what was happening.  Our evidence -- we will show that was then

shared internally in the company, including with Mr. Del Villar

and Mr. Scalisi.

Now, shortly thereafter, the decision has to be made

whether that artist is going to perform at the Aguas Calientes

concert, which is now a little over a week after the letter is

exchanged.

The -- what happened was -- is that his initial

flight was canceled.  He then ended up booking a charter flight

for him to fly down late on the 27th to perform.  That flight

was booked using Defendant Del Villar's credit card and I.D.

which was sent to the booking person by Mr. Scalisi and, again,

from the Government's perspective, after they had known about

the designation.  So these are the acts they took to then

continue to go forward with the concert that was being promoted

by Defendant Perez.

The -- if I may have a moment, Your Honor.

So that concert actually did take place in the early

morning hours of the 28th.

So in terms of the conspiracy, that largely is the

first evidence of the conspiracy to violate the act.

Now, it goes on because we now alleged additional

concerts.  But in terms of proving that, there are a few

additional pieces of evidence.  There's the voicemail recording

from Mr. Scalisi, which is in English.  That's a piece of

evidence we would introduce in which he's talking to another

employee at the company about -- he doesn't use the word

"treasury department" or "OFAC," but he says Angel is under

Homeland Security watch.  He talks about --

THE COURT:  And Angel is Mr. --

MR. BALDING:  Angel is Mr. Del Villar, I'm sorry,

yes.  Angel is Mr. Del Villar, the president -- or the CEO.

THE COURT:  Thank you.

MR. BALDING:  Defendant No. 2.

And basically the need not to create a paper trail

between Chucho, who is Defendant No. 4, Mr. Perez, and Angel.

There's also a text exchange between Mr. Del Villar

and that employee in June, shortly after this all happened so a

month and a half or so, in which -- what happened is there was

a dispute over the flight, the charter flight, the cost, with

the company, which the company ultimately prevailed.  But,

internally, it looked -- the company -- excuse me -- the

charter company prevailed.  It looks like the defendant,

Mr. Del Villar, they're not happy with the cost of the flight.

So there's a dispute.

In that context, there's a text exchange with an

employee of the company between Mr. Del Villar and the employee

where the employee says -- let me just get the wording correct.

He talks about, "You said Chucho was going to pay for that flight."  And he talks about, "I warned you not to do business with someone, a U.S.-sanctioned person."  And, again, that's Mr. Del Villar's exchange in that.

10:21AM        Now, going forward, we have additional evidence. And if you look at the Indictment, it's the substantive counts. So the conspiracy count -- one of the elements of the crime is that the person or the entity be a U.S. person.  Not in the conspiracy count, however, Your Honor.

10:21AM        So for a substantive violation, we haven't charged Mr. Perez.  He is not a U.S. person.  But he is a defendant in the conspiracy count, if that clarifies or if that is at all unclear.  But Mr. -- the company Del Entertainment as well as Defendants Del Villar and Scalisi are U.S. persons as defined under the Act.

        So they're charged also with substantive violations. So what happens is later on, there are additional concerts, which agents have now investigated and looked at bank records, spoken to other informants.  There's testimony from informants that can verify this.

        But, essentially, that Perez continued to surreptitiously promote concerts in Mexico for artists of Del Entertainment and was paid through intermediaries.  So we've charged those as additional violations of the Act.  They also fall within the conspiracy period.

| | |
|---|---|
| 1 | THE COURT:  Perez -- who was paid through |
| 2 | intermediaries? |
| 3 | MR. BALDING:  Excuse me.  Perez paid back to the |
| 4 | company -- |
| 5 | THE COURT:  Del -- |
| 6 | MR. BALDING:  Excuse me.  Yes.  Perez would keep a |
| 7 | cut.  So what would happen is there would be a concert in |
| 8 | Mexico -- again, otherwise legitimate concert but a concert. |
| 9 | They'd split the money somehow.  And typically Perez, yes, he |
| 10 | would actually have the physical proceeds in pesos.  He would |
| 11 | keep some of that as his cut and, through his intermediaries, |
| 12 | pay some of it to either Del Entertainment's Mexico-based |
| 13 | accounts, which is called the Del Melodia account.  It's a |
| 14 | Mexico account -- |
| 15 | THE COURT:  Can you spell Melodia for the record? |
| 16 | MR. BALDING:  Del Melodia.  M-e-l-o-d-i-a. |
| 17 | THE COURT:  Thank you. |
| 18 | MR. BALDING:  And so the allegation is that many of |
| 19 | those concerts that were promoted through intermediaries were |
| 20 | actually violations of the Act because they're either attempts |
| 21 | to evade or transactions with Mr. Perez who's still designated |
| 22 | at that time. |
| 23 | Now, specifically, there are a few additional pieces |
| 24 | of evidence which kind of establish that.  There is a recording |
| 25 | with Defendant Scalisi in January -- approximately January of |

10:22AM — line 5
10:23AM — line 10
10:23AM — line 15
10:23AM — line 20
10:24AM — line 25

2019 with the employee I spoke of earlier in which Mr. Scalisi is talking with this employee about the record, the bank records.  And in that, they talk about -- excuse me -- they talk about concerts.  And Mr. Scalisi essentially says it's not going to be under Chucho's name in the internal books.  It's going to be -- and he lists three individual names.

Now, if you look at the internal company documents which were obtained by search warrant, those names -- two of them correspond to payments that are charged in the Indictment. So, in other words, that's the link between those specific charged counts and the -- excuse me -- the Indictment.

There's also -- we obtained from Perez several years ago through his attorney statements, copies of transfer -- excuse me -- receipts for payments.  Those were also found in a search warrant of the company's data to match, to show that these receipts for these concerts were being paid.  So that's additional evidence of that connection.

We also got from the Mutual Legal Assistance Treaty, MLAT, from Mexico, we got bank records -- or we obtained bank records from the Del Melodia account.  But also, we'll introduce to help confirm that those payments came from -- some were then transmitted to an account for Del Entertainment, Incorporated, the named defendant here.

There's more, Your Honor, I could get into, but I don't know if I've -- I think that's the main thrust of the

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Government's evidence.                                        |
|       | 2  | THE COURT:  Thank you.  That's sufficient.                   |
|       | 3  | How long do you -- so I am -- this maybe is a                |
|       | 4  | question for defense counsel and maybe now is not the time.  |
| 10:26AM | 5  | But I assume the United States is anticipating one trial with |
|       | 6  | all the defendants?                                          |
|       | 7  | MR. BALDING:  Well, all the defendants present,              |
|       | 8  | Your Honor, to the extent -- you know, if Mr. Perez shows up, |
|       | 9  | then, yes, we'd love to add him.  But I don't think he should |
| 10:26AM | 10 | hold up the trial with the present defendants, yes.          |
|       | 11 | THE COURT:  Okay.  Thank you.                                |
|       | 12 | And how long do you anticipate that trial being?            |
|       | 13 | MR. BALDING:  I don't anticipate the Government's           |
|       | 14 | case in chief taking longer than three to four days.        |
| 10:26AM | 15 | Now, I would like to explain a little bit about             |
|       | 16 | discovery at some point because the volume of discovery is much |
|       | 17 | larger and doesn't reflect the -- what I think is the length or |
|       | 18 | the anticipated length and the focus of the trial, but there |
|       | 19 | are reasons for that.                                        |
| 10:27AM | 20 | THE COURT:  Okay.  How many witnesses do you                 |
|       | 21 | anticipate?                                                  |
|       | 22 | MR. BALDING:  One moment, Your Honor.                       |
|       | 23 | Between six and eight is probably --                         |
|       | 24 | THE COURT:  You need a moment to consult with your          |
| 10:27AM | 25 | agent?                                                       |

1    MR. BALDING:  No.  I think between six and eight.

2  I'm trying to -- maybe up to ten.  But if there's more than

3  eight, it would be brief as additional.

4    THE COURT:  And you don't necessarily need to

10:27AM  5  identify them for me by name, but who are these witnesses?

6    MR. BALDING:  So there would be the case agent who

7  provided the letter.  There -- contemplated someone who could

8  do some sort of testimony, potentially expert testimony on OFAC

9  designations or just something to inform the jury -- although,

10:27AM  10  that would be very brief, I think -- potentially the employee,

11  the publicist who I first mentioned when that letter was

12  written, potentially the employee who was present at some of

13  these recordings, potentially the artist who received the

14  letter, potentially a cooperating defendant in another matter,

10:28AM  15  who I didn't get into his testimony but, essentially, it would

16  be -- and defense is aware of the -- you know, the existence of

17  these people, if not the identities.

18    The cooperating defendant was a high-level associate

19  of Defendant Perez and was involved in drug trafficking with

10:28AM  20  him and would testify that Perez continued to do business

21  surreptitiously with Del Villar after the designation.  There

22  would be potentially someone to testify as to the results of

23  the searches that the -- documents obtained and to explain some

24  of the financial information that confirms what happened.

10:29AM  25    THE COURT:  And by "somebody," you mean an expert

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:29AM | 5 |

1  or --

2          MR. BALDING:  No.  I think it might be the case

3  agent, so it might be that same person to tell.  But there

4  might be a second case agent or other agent that's more

5  familiar with those specifics.

6          Mr. Scalisi did make statements.  I don't know

7  that -- this is after a search warrant was executed in May of

8  2019.  To the extent we want to introduce those, there might be

9  a brief witness who was present at that interview.

10          May I have a moment, Your Honor?

11          THE COURT:  Yes.

12          (Pause in the proceedings.)

13          MR. BALDING:  I'm sorry.  I misspoke.  The search

14  warrant was May of 2020, not 2019.

15          THE COURT:  Thank you.

16          MR. BALDING:  And then, also, the individual who

17  worked for the charter company, the jet that was hired, he's a

18  private individual.

19          So those are the key witnesses, I would think,

20  Your Honor.  There may be -- give or take, I apologize if I

21  missed one or two.  But I think, if I did, they would be brief.

22          THE COURT:  And in terms of expert testimony, you

23  anticipate perhaps somebody to talk about the OFAC of any

24  profits.  Any other expert witnesses that you anticipate?

25          MR. BALDING:  Not in this case.  And even that might

**UNITED STATES DISTRICT COURT**

1    not be necessary, depending on the jury instructions.  I think

2    the parties -- we work very productively and professionally, so

3    I think those type of issues I don't anticipate being

4    significant.

10:30AM  5          THE COURT:  Okay.  And then in terms of audio or

6    video recordings, it sounds like you have a number of

7    recordings of conversations allegedly between some of the

8    defendants and others in their company or others.  And are

9    there video recordings?

10:31AM  10          MR. BALDING:  Some of them have a little video, but

11   it's not particularly helpful.  If it is, it's accompanied by

12   audio, so we'd play both but --

13          THE COURT:  What is the video of?

14          MR. BALDING:  It would be just kind of the space.

10:31AM  15   It's, you know, a hidden camera that's being used.  So it could

16   be the person they're talking to or just --

17          THE COURT:  I see.  I see.  Okay.

18          So the recordings, they were secret recordings by

19   people, it sounds like, in the company or others talking to the

10:31AM  20   defendants.

21          MR. BALDING:  That's correct.

22          THE COURT:  Okay.  Were there -- was there video

23   recordings of the search warrant or search warrants?

24          MR. BALDING:  Nothing we would introduce.  There's

10:31AM  25   an audio recording of Mr. Scalisi's interview, but I think

**UNITED STATES DISTRICT COURT**

that's -- I can't think of any video -- there's -- practically

speaking, I don't think there's any video I would anticipate

the Government relying on.  There might be audio recordings

that are accompanied by some video.  But, again, the audio is

10:32AM   for, in large part, the evidence.

Most of the audio we would introduce is in English.

Some is in Spanish.  To the extent it's in Spanish, we would

have -- we'd have a translated transcript.  We have transcripts

of what we would use.  We also have transcripts for the

10:32AM   English, which, you know, at trial we play them together, but

the evidence would be the English recording, my understanding.

THE COURT:  Okay.  That was going to be my next

question -- well, my next two questions.

So with respect to transcripts, you have transcripts

10:32AM   for all of the audio recordings that you plan to use.

MR. BALDING:  Yes, Your Honor.

THE COURT:  And then my other question was going to

be about whether any recordings or testimony that you

anticipate in a language other than English, it sounds like

10:32AM   some of the recordings are in Spanish and you have transcripts

in English.  And we may have to work out with the defendants if

they agree with your translation.

And -- but you don't anticipate -- none of your

witnesses that you anticipate testifying will be testifying in

10:33AM   a language other than English.

21

         1              MR. BALDING:  It's possible, Your Honor, but at this

         2    time that's correct.

         3              THE COURT:  Okay.  The cooperate -- for instance,

         4    the cooperating defendant.

10:33AM  5              MR. BALDING:  I think that defendant may only speak

         6    Spanish, and so there may be one to two witnesses that speak

         7    Spanish, would need a translator.

         8              THE COURT:  Okay.  Besides the interview that you

         9    mentioned of Mr. Scalisi, which I understand took place in May

10:33AM  10   2020 when the search warrant was served, any other interviews

         11   of the defendants?

         12             MR. BALDING:  Not -- no recorded interviews, nothing

         13   we would intend to introduce.

         14             THE COURT:  Any other interviews, period?

10:33AM  15             MR. BALDING:  One moment.

         16             (Pause in the proceedings.)

         17             MR. BALDING:  Yeah, that's correct, Your Honor.

         18             THE COURT:  Any potential *Miranda* issues with the

         19   May 2020 Scalisi interview?

10:34AM  20             MR. BALDING:  I don't believe so.  Although, you

         21   know, there is mention of a lawyer.  I don't anticipate -- I

         22   don't think there are, but defense counsel may raise that

         23   issue.  So I certainly don't want to preclude them from making

         24   that argument.

10:34AM  25             THE COURT:  Have you -- what is the status of

UNITED STATES DISTRICT COURT

1      discovery at this time?

2              MR. BALDING:  And that's a -- the large -- larger

3      scale question that you might -- the discovery -- so there --

4      there's the discovery, if you would, related to the charged

10:34AM   5  conduct, which, in my opinion, is not incredibly large.

6      However, I am producing to the defense the entirety of the

7      investigation under, you know, whatever theory they want to

8      make that that could be relevant to the charged conduct,

9      whether it's to establish some sort of prior relationship or

10:34AM  10  lack thereof, whatever it is.  But there is a large amount of

11     discovery in that second bucket.

12              So the first bucket has largely been produced.  We

13     were working out the protective order, which did get worked out

14     but led to a little delay and did get out most of the initial

10:35AM  15  discovery.  I think the rest of that will go out very shortly.

16     They just provided a hard drive to me to put -- some of the

17     recordings are rather large, but there's not a huge delay

18     there.

19              I'm also processing --

10:35AM  20              THE COURT:  When you say "very shortly," what does

21     that mean?

22              MR. BALDING:  Well, I just got the hard drives

23     today.  So I think within the next week we'll load it or two

24     weeks, perhaps, but not -- you know, it's ready to go.

10:35AM  25              The larger investigation entails quite a bit of

discovery.  I'm talking, you know, hundreds of gigabytes,
hundreds of thousands of pages.  I don't know how relevant or
how much that will affect the trial.  However, you know, it's
defense prerogative to review it and decide their decision on
that.

          So, again, I don't think the volume of discovery is
necessarily going to lengthen the trial, but I think it needs
to get out.

          I'm working on producing that.  They were able to
come into my office and review that yesterday.  They didn't
obviously get through nearly a fraction of that.  But, again,
we're working collaboratively to make it available.  But given
some of the issues that arose with the protective order, being
a little more cautious with what is copied and sent over.

          That said, I think we've worked out largely
getting -- I think it will take a few weeks or maybe a month or
two to finally get all that over.  So I think there is some
delay there.  But it's made available at any time but -- again,
this is discovery which relates broader to the investigation.
There were several wiretaps, things like that.

          THE COURT:  And remind me, you already have a
protective order issued in this case.

          MR. BALDING:  We do, Your Honor.  That was, I
believe, last week.

          THE COURT:  Okay.  And when you mentioned sort of

the broader discovery -- without necessarily binding you to a
legal position at this time, I understand that from the
Complaint that this investigation was conducted by a team of
federal, state, and local officials.  And so the discovery
you're producing is from all members of the team and --
including other agencies?

MR. BALDING:  Yes.  It would be a collection of DEA,
task force officers working, local officers who had reports on
arrests.  So there were seizures of money that occurred, for
example.  So we'd have the arrest reports and the local
instance -- again, that's not charged conduct, so I don't know
how valuable it is.  But it is in the discovery, yes.

THE COURT:  Okay.  Thank you.

And do any of the charged offenses have a mandatory
minimum?

MR. BALDING:  No, Your Honor.

THE COURT:  Okay.  Let me turn to defense counsel.
I will start with Mr. -- who's representing Del Entertainment?
That's you?

MR. ROTSTEIN:  I am, Your Honor.  James Rotstein.

THE COURT:  Okay.  Great.

Anything, first of all, that you want -- need or
want to comment on from what Mr. Balding explained, anything
that you need from the Court at this time?

MR. ROTSTEIN:  At this time, Your Honor -- there's

nothing we need as far as Del Entertainment at this time.
However, Mr. Roper on my left, we have agreed to speak on
behalf of all of us kind of to give a status of discovery and
raise some issues with the Court, if that's okay.

10:38AM

THE COURT:  Yeah.  That's fine.  Thank you.

And, Mr. Roper, you represent Mr. Del Villar?

MR. ROPER:  Yes, Your Honor.  I do along --

THE COURT:  Along with Mr. Jauregui.

MR. ROPER:  Pardon, Your Honor?

10:38AM

THE COURT:  Along with Mr. Jauregui.

MR. ROPER:  Yes, I was going to say that.

THE COURT:  Okay.  Thank you.

MR. ROPER:  We're at the same law firm.

THE COURT:  Okay.  Thank you.

10:38AM

MR. ROPER:  So, Your Honor, I'd like to expound on
what Mr. Balding said about discovery.  To give you a little
bit more specific information, we did agree to the protective
order.  Monday morning, I think we were able to access on the
USAfx side the first discovery, which was substantial.  We were

10:39AM

able to download that.  And we tried to go through it as best
we can through Thursday.  There's still a lot to go over.

And -- but we can tell from that discovery and also
in the material that we reviewed yesterday in Mr. Balding's
office that there is a lot of discovery in this case that we

10:39AM

think is, first, discovery involving the recordings of the

defendants, which we're entitled to under Rule 16.  And also,
we think there's evidence that would be material to our
possible defenses in the case.  Also, we think that there is
a -- information that could be *Brady* material in a sense that
it could be exculpatory or mitigating evidence.

Also, in light of what we think of some of the
witnesses, Mr. Balding mentioned that there were going to be
informants testifying.  In that case, we think there's
substantial *Giglio* material in the material that we -- we'll
look at in addition to what we've seen so far.

Mr. Balding said the investigation -- I thought he
said 2003.  I think maybe it was 2012, 2013.

THE COURT:  You did say 200- -- I think you said
200- --

MR. ROPER:  '3.

MR. BALDING:  It should be '13.

THE COURT:  You meant '13.  Okay.  You said 2003.

MR. ROPER:  I heard '03.

MR. BALDING:  If I misspoke, I apologize.

MR. ROPER:  Well, it goes back.  I actually saw a
report, I thought it said the latter part of 2012.

But the -- the -- and it's important to highlight
the fact that you go back to that investigation and it involves
Perez, was one of the subjects of that investigation way back
then.

1          So we think that's all relevant --

2          THE COURT:  Defendant No. 4.

3          MR. ROPER:  Pardon, Your Honor?

4          THE COURT:  Defendant No. 4.

10:41AM  5          MR. ROPER:  Yes, Your Honor.

6          And we think, because of that, all of that we have

7    to review and it's substantial.  It involves -- we were able to

8    look at wiretap affidavits.  And I could be wrong, I counted up

9    five wiretap affidavits involving phones that were tapped as

10:41AM  10   well as culminating, I think, in a bug that was put in

11   Mr. Del Villar's offices.

12         And so you can imagine going back -- I saw some

13   wiretap affidavits in 2013, 2014, 2015, 2016 maybe.  And

14   there's substantial recordings that we need to review or at

10:42AM  15   least look at the cuts.  But obviously, they're discoverable

16   under Rule 16 because they're recordings of defendants and we

17   would say co-conspirators, co-defendants.  Mr. Balding

18   mentioned that there was another defendant who was in another

19   investigation that would testify that may entail some more

10:42AM  20   discovery dealing with *Giglio* material.

21         But as you can imagine, because of that -- and we

22   haven't seen it yet because we haven't gotten the material.

23   But we anticipate it would be a substantial review, just the

24   wiretap information.

10:42AM  25         Now, there was -- we understand the search warrant

was executed in May of 2020.  And there was substantial

evidence, e-mails that were seized from a file server and

computers as well as WhatsApp messages, other e-mails.  And I

understand from my involvement that there was a tape team

10:43AM   review process that was in place on that.

There was also --

THE COURT:  I'm sorry.  Tape team?

MR. ROPER:  Tape team review.

THE COURT:  Okay.  Thank you.

10:43AM   MR. ROPER:  Of items seized during the course of

that search warrant.

THE COURT:  Because the search warrant was of the

offices of Del Entertainment?

MR. ROPER:  Yes, Your Honor, it was.  And there was

10:43AM   also the phones of Defendant Scalisi and also

Defendant Del Villar.  Those are also imaged and searched.

There was also, we found out -- and I haven't seen

the evidence and -- but I understand there was also a search

warrant obtained early on, perhaps even as early as 2015 -- and

10:44AM   again, I could be wrong.  Of course, Mr. Balding can correct

me.

But I understand there was a search warrant done of

the Internet service provider to obtain e-mails back during

that time period.  Of course -- and I understand in that case,

10:44AM   there was also a tape team review set up for that.  And, of

course, that would involve even more, essentially two file
servers, of information -- or e-mails of two different time
periods that would involve substantial review as well.

THE COURT:  And the purpose of the tape team review,
to your understanding, was to look for attorney-client
privileged material?

MR. ROPER:  Yes, Your Honor.  I was actually
representing Del Entertainment and Mr. Del Villar during --
right after the search warrant.  And I can -- I did talk to the
AUSA that was on the case and asked for the return of all
privileged communications.  And in response to that, he and I
worked together and he agreed to set up a tape team review to
review those e-mail communications.  So I know -- I was
actually personally involved in that -- in the one that took
place after this latest search warrant.

Now, I did not know until yesterday that there was a
search warrant from an Internet service provider to find
e-mails -- and I understand from the little bit I could see in
the affidavits that there actually was a tape team review set
up at that point.

But my point in raising all this is to say,
Your Honor, we're going to need time to review this, a
substantial amount of time.

Also, this involves a new statute that I -- I wonder
how many times this has been prosecuted in the Central District

of California or even -- I know in the country and there
haven't been that many cases, it's relatively new.  The
Department of Justice is, I think, more and more taking --
looking at prosecuting under the Kingpin Act.  But there hasn't
been a lot of case law, there's not a lot of body of law out
that relates to this.  And I think that would include some
review.  But all in all, we would say we're going to need a
substantial amount of time to review this material.

The protective order -- I understand it's in place.
We agreed to it.  But that in some instances hinders our
ability to work with our clients to review that because we have
to be there and -- and it's going to take some time,
Your Honor, to go through that.

And so we -- we would anticipate filing a
continuance motion in this case and ask for additional time to
review this material.  And it could take a while.  And it could
involve filing pretrial motions at some point.  We're not at
that point right now.  Obviously, we need to look at it.

But, hopefully, if Mr. Balding says in two weeks
we'll get the hard drive, then that will -- we'll start that
process in doing that.

Let me see if I'm missing anything else from my
co-counsel.  Ms. Romero may have something to say.

THE COURT:  Okay.  Before you come up, Mr. Roper,
what are you anticipating?  When you say a substantial amount

|     | of time, what are you anticipating in terms of a continuance? |
| --- | --- |

1   of time, what are you anticipating in terms of a continuance?

2            MR. ROPER:  Well, we have -- I took the liberty of

3   asking my co-counsel for trials.  And I can tell you -- first,

4   let me tell you my trial schedule.

10:47AM   5            THE COURT:  Let's leave aside everybody's trial

6   schedules.  I just want to get a sense of the ballpark that

7   you're thinking about in terms of a continuance.

8            MR. ROPER:  We're thinking about a year, Your Honor,

9   to October of 2023.

10:48AM   10           THE COURT:  And have you discussed this with the

11   prosecutor?

12           MR. ROPER:  Yes, Your Honor, we did.

13           THE COURT:  Okay.  And, Mr. Balding, do you have an

14   objection to a continuance of that length?

10:48AM   15           MR. BALDING:  It -- my initial response is that it

16   seems a little lengthy, but if they -- it's not outrageous.  I

17   just would like that to be a firm date.  And if we all know

18   that that's the date and it's not going to move and they have a

19   justification by trial conflicts and the discovery, that's

10:48AM   20   okay.  I would personally push for a little earlier if I had my

21   druthers, but that's my position.

22           THE COURT:  Okay.  Thank you.

23           Anything else?

24           MR. ROPER:  I would just add a footnote to what I

10:48AM   25   said.

1          THE COURT:  Yes.

2          MR. ROPER:  I have a trial starting in the Eastern

3     District of Texas on September 11th, actually, and it would be

4     a three-week trial.  So I would -- if we do put it in October,

10:48AM  5     which we're willing to do, we'd ask maybe perhaps in the

6     middle, if you could.

7          THE COURT:  Okay.

8          MR. ROPER:  That would help me.

9          And I'll yield the floor to Ms. Romero.

10:49AM  10         THE COURT:  Thank you.

11         MS. ROMERO:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MS. ROMERO:  And just briefly, I would add what

14    Mr. Roper said about time to review evidence and prepare our

10:49AM  15    defense of this case.  And because there are, as Mr. Balding

16    mentioned, records in Mexico, there are also witnesses in

17    Mexico that are pretty relevant to the defense of this case.

18    And so we would have to go there, interview the witnesses, work

19    through the process to be able to get the proper travel

10:49AM  20    documents for these witnesses to appear before the Court at the

21    trial and also work through the process to get the records, the

22    bank records in such a format that they would be admissible for

23    the Court.

24         So we anticipate that would be time.  So that is

10:49AM  25    just a little bit additional information as to why we're

1  thinking maybe a year, October would be -- would be appropriate

2  for this case, for our defense.

3           THE COURT:  Okay.  Thank you.

4           MS. ROMERO:  That's what I have.  Thank you,

10:50AM  5  Your Honor.

6           THE COURT:  I appreciate that.

7           Was there anything else that you -- I was going to

8  turn to you at some point, but we can do that now, either

9  Ms. Romero or Mr. Tenley, anything further that you need to

10:50AM  10 share on behalf of Mr. Scalisi?

11          MS. ROMERO:  Nothing, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          And then anything further from counsel for the other

14 defendants that you need to share with respect to timing or

10:50AM  15 anything else that we discussed this morning?

16          Mr. Rotstein?

17          MR. ROTSTEIN:  Nothing from me, Your Honor.

18          THE COURT:  Okay.  Mr. Roper or Mr. Jauregui?

19          MR. ROPER:  Nothing else.

10:50AM  20          THE COURT:  No?  Okay.  Thank you.

21          And, Mr. Del Villar, you were able to hear

22 everything okay?  Do you need to speak with your attorneys

23 before we close the hearing?

24          DEFENDANT DEL VILLAR:  I'm okay, Your Honor.

10:50AM  25          THE COURT:  Okay.  Thank you.

|  | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:51AM | 5 |

And so let's talk about -- so I will just -- I'll wait for the parties' motion for continuance.  Hopefully it will be a joint stipulation, given what the United States has described about the nature of the case and the nature of the evidence and the complications that defense counsel has described concerning the protective order, the electronic nature of the evidence that obviously you need to coordinate amongst yourselves and potentially this Mexico element, the continuance of a year doesn't seem outrageous.

I would, however, agree with the position of the United States that I don't think we want it to go too far past that, in particular because, if you're looking at October and you push past October, all of a sudden you're in the following year because you have the holidays.

So I will review the -- hopefully it will be a joint stipulation but, if it's not, a motion for continuance and consider it carefully.  I'm inclined to grant it, but I do want the parties, especially defense counsel, to hear from me, then I will consider that to be a firm date.

So I will expect the parties to move with alacrity. And to the extent that there are issues or delays that the Court can assist with, that you bring it to the Court's attention as soon as possible.  And the Court will not be particularly sympathetic to additional requests for continuance if the time was not used efficiently.

1    I haven't done this in my other cases, but I wonder

2    if it might be useful to have some interim status conference in

3    this case just to check in and -- you know, sometimes a

4    deadline or a hearing helps people to get organized.

10:52AM   5    So I will just -- I'll consider that and I will --

6    if the parties are amenable to that, then maybe you can

7    include -- if you have some agreed-upon check-in dates,

8    maybe -- I don't know, maybe two check-ins between now and then

9    or every few months, you can put those dates in your -- in your

10:52AM   10   continuance or stipulation.

11   And if I may -- before we get to the passport issue,

12   with respect to the two individual defendants, it is my -- as

13   the parties may know, I was on the Superior Court before.  So

14   it is my practice to, when I can, take an oral waiver from the

10:53AM   15   defendants of their speedy trial rights.  I know you don't have

16   a specific date.  But I do feel better having a personal

17   conversation with the defendants about their speedy trial

18   rights.

19   This is in no way questioning the conversations that

10:53AM   20   you're having with your clients.  And I trust that you will be

21   having full discussions and you will fully advise them in any

22   stipulation that I see that's signed by them, they've been

23   fully advised.  But it does make me feel better to know that

24   I've spoken with them.

10:53AM   25   So if that's okay with you, Ms. Romero, may I have a

```
 1    brief colloquy with Mr. Scalisi?

 2              MS. ROMERO:  Absolutely, Your Honor.

 3              THE COURT:  Okay.  And you can remain seated.

 4              So the main thing, Mr. Scalisi, is I want you to

 5    know that you have what is called the right to a speedy trial.

 6    And so that you have the right to go to trial 70 days from

 7    your -- I believe it's your first appearance.

 8              And so right now, we've scheduled the jury trial for

 9    you -- I believe it's August 16th is the date that we have.  Is

10    that counsel's understanding?

11              MS. ROMERO:  Yes, Your Honor.

12              THE COURT:  And so that's within that period of

13    time.  And you have the right to go to trial then and before

14    this 70-day period, if you so wish.  Do you understand that?

15              DEFENDANT SCALISI:  I do understand that.

16              THE COURT:  Okay.  And as you've heard, your

17    attorneys have explained why they may be seeking a continuance,

18    a pretty significant continuance, which they believe will be of

19    assistance to you.  Do you understand that?

20              DEFENDANT SCALISI:  I do understand that,

21    Your Honor.

22              THE COURT:  And keeping in mind that we haven't

23    agreed on a specific date -- we haven't agreed on a specific

24    date but we're talking potentially October of next year, that's

25    14 months out, do you -- do you understand the request that
```

```
 1  they're considering?
 2              DEFENDANT SCALISI:  I do understand the request.
 3              THE COURT:  And do you agree in principle to that
 4  idea of giving up your speedy trial rights and have the trial
 5  happen over a year from now?
 6              DEFENDANT SCALISI:  I do, Your Honor.
 7              THE COURT:  And do you have any questions for me
 8  about that or your attorneys?
 9              DEFENDANT SCALISI:  No, Your Honor.
10              THE COURT:  Okay.  Thank you.
11              And the record will reflect the Court has taken an
12  oral waiver from Mr. Scalisi of his speedy trial rights.
13              And let me turn to Mr. Del Villar, same conversation
14  that I had with Mr. Scalisi.
15              With both of you, I never want any defendant to feel
16  like they are pressured into postponing their trial if they
17  want their trial sooner.  And it's important to me that all
18  defendants understand that they do have the right to go to
19  trial within that initial period.  And if they're agreeing to
20  postpone it, it's because they've had a conversation with their
21  attorneys and they think that's best for them.
22              So, Mr. Del Villar, you also understand that you
23  have the right to go to trial within 70 days and we've
24  currently scheduled your trial for August 16th?
25              DEFENDANT DEL VILLAR:  Yes, Your Honor.
```

10:55AM (line 5)
10:55AM (line 10)
10:55AM (line 15)
10:55AM (line 20)
10:56AM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Yes?

 2              DEFENDANT DEL VILLAR:  Yes.

 3              THE COURT:  Okay.  And you understand the discussion

 4   that we just had with -- with your attorney, Mr. Roper, about

 5   potentially postponing the trial to October of next year?

 6              DEFENDANT DEL VILLAR:  I do understand.

 7              THE COURT:  Okay.  And keeping in mind that we don't

 8   have a specific date in mind, are you amenable to giving up

 9   your right to a speedy trial and postponing your trial until

10   October of next year?

11              DEFENDANT DEL VILLAR:  Yes, Your Honor.

12              THE COURT:  Okay.  And do you have any questions for

13   me or for your attorneys about this?

14              DEFENDANT DEL VILLAR:  No, I don't.

15              THE COURT:  What was that?

16              DEFENDANT DEL VILLAR:  No, I don't.

17              THE COURT:  Okay.  Thank you.

18              So the record will reflect the Court has also taken

19   an oral waiver from Mr. Del Villar.

20              And with respect to the corporate defendant, I don't

21   need to take an oral waiver at this time.

22              Let me talk about, then, the passport issue, if we

23   can.  Oh.  And let me set a deadline for the continuance

24   because right now the trial is set for August 16th.  And I

25   won't really be able to relax until we have a new trial date
```

10:56AM (lines 5)
10:56AM (line 10)
10:56AM (line 15)
10:56AM (line 20)
10:57AM (line 25)

1    because it will be my obligation to get ready for the 16th.

2    And we're not that far away from the 16th.

3              So I would like the parties to -- what I would

4    prefer is if the parties were to file their continuance, either

5    their joint stipulation or their motion, by Tuesday.  But let

6    me just confer, I'll start with Mr. Roper, if you anticipate

7    being able to do that.

8              MR. ROPER:  We can, Your Honor.

9              THE COURT:  Okay.  So I am going to order that any

10   party that wishes to continue the matter, that the motion for

11   continuance or joint stipulation be filed by Tuesday,

12   August 9th.

13             Okay.  And then the passport issue, I just had a

14   question about that.  And I assume it's okay to talk about it

15   in the presence of the other defendants --

16             MR. JAUREGUI:  Yes, Your Honor.

17             THE COURT:  -- defense counsel?

18             MR. JAUREGUI:  Would you like me -- is it okay for

19   me to stand here or --

20             THE COURT:  You can take the podium.  Thank you.

21             So my question was just, it's my understanding that

22   as part of the conditions of release, Mr. Del Villar's passport

23   was taken from him.

24             MR. JAUREGUI:  Correct.

25             THE COURT:  And the magistrate judge, you know, I'm

sure had a hearing and had reasons for doing so.  So the idea
of returning the passport raises some questions in the Court's
mind.  But I did want to speak with you because perhaps the
concerns that I have you already have a logistical way of
dealing with them.

And what seems to me risky, in light of whatever
information the magistrate judge had, is to just give
Mr. Del Villar the passport for a period of three days because
anything could happen in the three days, as opposed to -- if
what the parties were contemplating is that the pretrial
services officer with the passport would be present with
Mr. Del Villar at the firearms entity and would never
relinquish the passport to Mr. Del Villar or that you're taking
responsibility, that you're never going to relinquish the
passport to Mr. Del Villar.  So that's what the Court's concern
is.

MR. JAUREGUI:  I understand the concern, Your Honor.
I did speak about it with Officer Singh.  And so where we
landed was that the passport would be released only to me.  I
would not be providing it to Mr. Del Villar.  In fact, I would
just travel -- in the proposed order, I put it counsel so that
it could be me or Mr. Roper.  But one of us would travel to
Western Firearms, show them the passport, allow it to scan it
and return it to Officer Singh.  In fact, I think I had
initially just proposed having it for a day.  And she said she

would be -- or maybe two days, and she said she would be

comfortable with me having it for up to three days, which is

how the proposed order is structured.  But the wording in the

proposed order would be that it would be released only to

counsel.

And if I may, Your Honor, there's one other thing

just in the interest of full transparency.  So I called the

representative from Western Firearms because I couldn't tell

quite why he needed Mr. Del Villar's passport because it

appears that what you need is the passport of the person to

whom the firearm is being transferred.

Again, in the interest of full transparency, what he

said to me was, "I may be audited, and I need to have the

passport of both the person making the transfer and the person

receiving the firearm.  So that is why I'm requiring it."

Final point, Your Honor, my understanding is that --

and again, since the Government is represented both by the

agent and the prosecutor here, my understanding is the

naturalization certificate was also taken, which is why we

don't have the option of doing that.

So hopefully that answers the Court's questions

about why the passport is necessary and who will have custody,

physical custody over the passport.

I am also not opposed, if Officer Singh is willing,

to go with Officer Singh or just have her go to Western

1    Firearms.  But, of course, I didn't want to burden her with

2    that.

3              THE COURT:  Right.  Understood.

4              Okay.  Well, either of those options is fine with

11:01AM  5    me.  I will look at the language in the proposed order.  And if

6    I feel it needs to be tightened up in any way, I will do so.

7              And I think you understand what the Court's concern

8    is.  And what I definitely don't want to happen is that the

9    passport is released to Mr. Del Villar even for a brief period

11:01AM  10   of time.  And again, I -- I am not the judge who imposed the

11   conditions of release, so I don't know everything that went

12   into it.  But I trust that it was with good reason, so I'm

13   reluctant to depart from it.

14             MR. JAUREGUI:  Understood.  And just for background,

11:02AM  15   Your Honor, I don't know that there was much discussion at all.

16   It's part of the general conditions Mr. Balding indicated he

17   wanted, and we said that's fine.

18             THE COURT:  Okay.  Wonderful.

19             And so I will -- I'll attempt to get that out

11:02AM  20   quickly.

21             Was there a particular urgency to this -- I guess

22   because Mr. Del Villar wants to quickly comply with the

23   firearms transfer issue.  But is it something you were planning

24   on doing today or sometime next week or --

11:02AM  25             MR. JAUREGUI:  No, Your Honor.  I think

|  | 1 | Mr. Del Villar is in compliance as far as the sort of strict |
|---|---|---|
|  | 2 | interpretation of the conditions.  This would actually be |
|  | 3 | transferring them over sort of legally as opposed to just |
|  | 4 | physically transferring them to someone else. |
| 11:02AM | 5 | THE COURT:  Okay.  So you'll probably see that next |
|  | 6 | week. |
|  | 7 | MR. JAUREGUI:  Thank you, Your Honor. |
|  | 8 | THE COURT:  Okay.  Mr. Balding, anything further |
|  | 9 | from you? |
| 11:02AM | 10 | MR. BALDING:  No, not that I can think of. |
|  | 11 | And just it will be a joint stipulation to continue. |
|  | 12 | I think I'll draft that up. |
|  | 13 | THE COURT:  Okay.  Wonderful.  I appreciate it. |
|  | 14 | And anything from any of the defense counsel? |
| 11:03AM | 15 | MR. JAUREGUI:  No, Your Honor. |
|  | 16 | MS. ROMERO:  Nothing Your Honor. |
|  | 17 | MR. ROTSTEIN:  No, Your Honor. |
|  | 18 | THE COURT:  I do very much appreciate the parties |
|  | 19 | coming in today and for the thorough explanation of what the |
| 11:03AM | 20 | case is about and the concerns that defense counsel has.  I |
|  | 21 | look forward to seeing your stipulation for a continuance by |
|  | 22 | August 9th, together with some proposed dates for some check-in |
|  | 23 | status conferences. |
|  | 24 | To Mr. Scalisi and Mr. Del Villar, you are well |
| 11:03AM | 25 | aware of your conditions of release.  I just emphasize those |

```
 1   are extremely important.  I think everyone would like to see

 2   you remain out of custody.  And the decision about whether you

 3   remain out of custody is largely in your hands and the extent

 4   to which you comply with those conditions.  So I trust that

 5   there will be no issues with that.

 6             And, Mr. Del Villar, again, I hope that you are

 7   feeling better soon.

 8             Okay.  Take care.

 9             The matter is taken under submission.

10             (Proceedings concluded at 11:03 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES   )
                               )

4   STATE OF CALIFORNIA     )

5

6          I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17           DATED THIS 28TH DAY OF SEPTEMBER, 2022.

18

19

20                 /S/ MYRA L. PONCE
                         _____
21         MYRA L. PONCE, CSR NO. 11544, CRR, RDR
              FEDERAL OFFICIAL COURT REPORTER
22

23

24

25

**UNITED STATES DISTRICT COURT**